IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES PAVLIK, | : | |
| | : | |
| Plaintiff | : | CIVIL NO. 4:10-CV-2305 |
| | : | |
| vs. | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | (Judge Rambo) |
| SECURITY, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM AND ORDER

## Background

Plaintiff, James Pavlik, is seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for social security disability insurance benefits.  For the reasons set forth below, we will affirm the decision of the Commissioner.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is

undisputed that Pavlik meets the insured status requirements of the Social Security Act through December 31, 2012. Tr. 13, 15 and 142.[1]

Pavlik was born in the United States on October 17, 1962. Tr. 38, 65, 133 and 549.  During his elementary and secondary school years, Pavlik attended regular education classes, had average grades and did not complete any special job or vocational training. Tr. 209 and 549.  Pavlik graduated from high school in 1980 and can read, write, speak and understand the English language. Tr. 204 and 549.  He then attended college for four years and obtained a degree in business information systems from Robert Morris College in 1984. Tr. 38, 237 and 549.  After obtaining a college degree, Pavlik held several positions and then, after taking a "government placement examination," obtained a job with the Department of Defense in 1989 as an information technology specialist, specifically working as a computer programmer and Unix systems administrator, both

_____

1.  References to "Tr.___" are to pages of the administrative record filed by the Defendant as part of his Answer on January 21, 2011.

2

positions classified as skilled, sedentary work.[2] Tr.

59, 206, 235 and 549.   Pavlik was employed by the

_____

2.  The terms sedentary and light work are defined in
the Social Security regulations as follows:

> (a) *Sedentary work*. Sedentary work involves
> lifting no more than 10 pounds at a time and
> occasionally lifting or carrying articles like
> docket files, ledgers, and small tools.
> Although a sedentary job is defined as one
> which involves sitting, a certain amount of
> walking and standing is often necessary in
> carrying out job duties.  Jobs are sedentary if
> walking and standing are required occasionally
> and other sedentary criteria are met.

> (b) *Light work*.  Light work involves lifting no
> more than 20 pounds at a time with frequent
> lifting or carrying of objects weighing up to
> 10 pounds.  Even though the weight lifted may
> be very little, a job is in this category when
> it requires a good deal of walking or standing,
> or when it involves sitting most of the time
> with some pushing and pulling of arm or leg
> controls.  To be considered capable of
> performing a full or wide range of light work,
> you must have the ability to do substantially
> all of these activities.  If someone can do
> light work, we determine that he or she can
> also do sedentary work, unless there are
> additional limiting factors such as loss of
> fine dexterity or inability to sit for long
> periods of time.

20 C.F.R. § 404.1567.

Defense Department at the Defense Supply Center in Philadelphia until August 2, 2007.  Tr. 38.

Records of the Social Security Administration reveal that Pavlik had earnings in 1980 through 1983 and 1986 through 2008. Tr. 143.  From 1997 through 2006, his annual income exceeded $50,000.00. Id.  In 2007, Pavlik earned $28,760.77 and in 2008 $795.24.[3] Id.  His total social security earnings reported were $912,137.49.  Id.

Pavlik claims that he became disabled on August 2, 2007, because of work-related physical and mental health problems. Tr. 37.  The mental health problems identified were depressive disorder with psychotic features, a conversion disorder, anxiety, and posttraumatic stress disorder. Id.  The physical impairments identified were chronic regional pain syndrome/causalgia and disorders of the back. Id. Pavlik claims that the cause of his disability was an abusive work environment and a physical assault on April

---

3.  Pavlik testified that he stopped working on August 2, 2007, and the administrative law judge so found. There is no explanation for the reported earnings of $795.24 in 2008.

4

8, 2004, which aggravated pre-existing mental and physical conditions. Tr. 238.

On April 8, 2004, a co-worker threw a large cup of hot coffee onto Pavlik's upper back, shoulder, neck and head. Tr. 174 and 238.  After the incident, Pavlik cleaned up his work station and then talked with Ruben Filomeno, the Equal Employment Opportunity official on site, about the abusive treatment he was receiving in the office. Tr. 169 and 174.  After this conversation, Pavlik went home, took a shower, changed clothes and then returned to work. <u>Id.</u>  Pavlik then sent an email to several individuals including Mr. Filomena in which he stated in toto as follows: "Just to let you know. As the day went on, I am starting to experience some tightness in my right shoulder going down my arm and in my neck which is also causing my jaw to be tight. Along with this I have gotten a head ache (sic) and some tingling feeling in my head and neck area." Tr. 171 and 274. Pavlik also contended as a result of the incident he suffered burns to his scalp. Tr. 193.  Sometime after

the incident and before April 26, 2004, Pavlik filed a claim for federal workers' compensation benefits. <u>Id.</u>

Pavlik did not seek treatment for his alleged injuries until April 16, 2004. Tr. 260 and 274.  On that date he had an appointment with Gene I. Geld, D.O. <u>Id.</u> Dr. Geld's treatment notes are illegible. <u>Id.</u>  However, Dr. Geld sent Pavlik to Colleen T. Hall, a physical therapist. Tr. 261-262.  Pavlik told Ms. Hall that the burns he suffered "were observed by [a] hairdresser and other coworkers." Tr. 262.  Ms. Hall observed "pink skin" which "looked like a sunburn." <u>Id.</u>

On May 7, 2004, Dr. Geld completed a work capacity evaluation form in which he stated that Pavlik was able to perform his usual job but should be restricted to working 4 hours per day for one month. Tr. 182.  In or about May, 2004, Pavlik commenced working 4 hours per day. Tr. 39.

In May 2005, Pavlik claimed he was stabbed while using the workplace bathroom. Tr. 54 and 496.  This incident occurred on about May 23, 2005, and Pavlik went home cleaned and bandaged the wound and went right back

to work. Id.  Pavlik did not report the incident until several days later and then first to George L. Rodriguez, M.D., a treating physician, who was seeing Pavlik for other conditions. Tr. 492-497.  At that appointment, which occurred on May 26, 2005, Dr. Rodriguez observed a "healing by 2nd intent"[4] 1/4 inch puncture wound on Palvik's right flank at about the L5 level of the lumbar spine. Tr. 493.  Pavlik told Dr. Rodriguez that he did not see the assailant's face. Tr. 492.  Dr. Rodriguez sent a letter to Pavlik's supervisor regarding this incident. Tr. 496-497.  In the letter Dr. Rodriguez stated in part as follows:

> I have come to know Mr. Pavlik as a gentle, kind, and intelligent individual who is soft spoken and unassuming.  I am appalled with the way he was attacked on 4/8/04 and remain available to him for his treatment and counseling regarding this matter. . . .
>
> Today Mr. Pavlik has reported to me yet another assault that occurred to him while he was urinating in the bathroom at your facility . . .

---

4.  "Healing by 2nd Intention" is the process of healing without the benefit of surgical closure. Michael Mercandetti, M.D., Wound Healing and Repair, Medscape reference, http://emedicine.medscape.com/article/1298129-overview#aw2aab6b4 (Last accessed January 19, 2012).

I believe him and find that his story, as well
as wound, are consistent with the pattern of
abuse that he has suffered previously while
working at the same facility.

I am writing this letter to document this event
and ask for your assistance in protecting him.
. . . Of course, if nothing is done with respect
to Mr. Pavlik's safety, and he comes under
further harm this letter will document the fact
that you were requested by me, as his physician,
to take immediate and aggressive action in this
regard. . . .

Id.   Dr. Rodriguez sent a copy of the letter to

Pavlik's attorney and Senator Arlen Specter.[5] Id.

_____

5.   Dr. Rodriguez, along with Daisy A. Rodriguez, M.D.,
of Injury Rehabilitation Centers of Pennsylvania,
Philadelphia, treated Pavlik for several years. During
the course of this relationship, Pavlik frequently
corresponded with Dr. Rodriguez in writing. Tr. 164,
165, 166, 167, 168, 172 and 173.   In one undated
letter, Pavlik complained to Dr. Rodriguez about two
other physicians that were treating him as well as his
attorneys. Tr. 173.   In that letter he further asked
Dr. Rodriguez: "What can we do to make sure that
decisions are reached based on what you say and not
because of what others might have said?" Id.   Pavlik
further stated: "Please let me know what I can do about
this situation.   Any help that you can provide
concerning this issue would be greatly appreciated."
Id.   In another letter he complained to Dr. Rodriguez
about his work situation and relayed "Other news" as
follows: "Since work was to cheap to let me stay at a
hotel around where the training I was promised to get
was, management has decided to change my duties again
and give me a job that requires 100% typing supporting

(continued...)

Pavlik reported the incident to his work
supervisor on May 27, 2005. Tr. 158.  An investigation
was opened by Naval Support Activity Security Office and

---

5.  (...continued)
the efforts of the folks that kicked me out of their
area so I guess they can take credit for the work that
I have done and then get rid of me again.  The other
thing that is happening is that I am intensifying my
efforts to have management actually move me to a new
job at some other base. . . Other news: I still don't
get home as much as I should and as a result, I am
getting the feeling the girlfriend is moving on with
her life.  Hope you have a good day." Tr. 172. In a
note of November 27, 2006, to Dr. Rodriguez, Pavlik
stated: "It seems that the Labor Department has decided
to move on my case. Wish that I could talk with you
about this situation before I had the scheduled
appointment so that you could calm me down and properly
prepare me for the appointment. If there is any advice
that you can share with me (like what I should say or
how I should act or the roll this person is going to
play in the whole process; if this person is going to
be for me or against me), I would appreciate it. . .
Thanks again for your help and for being there for me
concerning my issues." Tr. 167.  In a note to Dr.
Rodriguez dated April 24, 2007, Pavlik stated: "I have
spent the better part of the month telling Dr. Doyle
how good you are and how you have been right with your
diagnosis and suggestions when it comes to my case. It
seems to me that people should lesson (sic) to you . .
. It seems that there is pressure building and that
movement needs to occur as I get closer to my next
appointment that is due to be set up by the Labor
Department . . . If you received a call from Dr. Doyle
the other day, the reason for the call was because of
my encouragement and because I feel that you need to be
a part of anything that is decided concerning my case
(everyone needs to be on the same page, right?)." Tr.
164.

then closed because of "a total absence of witnesses, suspects, and any evidence that an assault actually took place on the installation[.]" Tr. 153 and 158.

Pavlik was initially denied federal workers' compensation benefits but appealed that denial and was eventually awarded benefits in the amount of $3090.00 per month apparently based on the April 8, 2004, incident. Tr. 39 and 152-199.

Pavlik terminated his work[6] for the Defense Department on August 2, 2007, the alleged disability onset date.[7]

_____

6. Pavlik was working part-time, 4 hours per day, from May, 2004, to August 2, 2007. Tr. 39.

7. Pavlik, who was 44 years of age on the alleged disability onset date and is presently 49 years of age, is considered a "younger individual" under the Social Security regulations. 20 C.F.R. § 404/1563(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).  Younger individuals can more readily adjust to other work. Id.

On October 30, 2007, Pavlik protectively[8] filed an application for social security disability insurance benefits.[9] Tr. 13, 35, 65, 126 and 133-136.  On May 9, 2008, the Bureau of Disability Determination[10] denied Pavlik's application. Tr. 13 and 67-70.  On July 7, 2008, Pavlik requested a hearing before an administrative law judge. Tr. 71.  After approximately 17 months had passed, a hearing was held before an administrative law judge on December 17, 2009. Tr. 31-64.  On December 22, 2009, the administrative law judge issued a decision denying Pavlik's application for

_____

8.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

9.  In the application, Pavlik alleged a disability onset date of April 8, 2004. Tr. 133. However, on November 14, 2007, Pavlik amended the alleged onset date to August 2, 2007. Tr. 140.

10.  The Bureau of Disability Determination is an agency of the Commonwealth of Pennsylvania which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration. Tr. 67.

benefits. Tr. 13-25.  On February 1, 2010, Pavlik filed a request for review of the administrative law judge's decision with the Appeals Council of the Social Security Administration. Tr. 6-9.  On September 2, 2010, the Appeals Council concluded that there was no basis upon which to grant Pavlik's request for review. Tr. 1-5. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

On November 6, 2010, Pavlik filed a complaint in this court requesting that we reverse the decision of the Commissioner and award him benefits, or remand the case to the Commissioner for further proceedings.

The Commissioner filed an answer to the complaint and a copy of the administrative record on January 21, 2011.  Pavlik filed his brief on May 2, 2011, and the Commissioner filed his brief on May 31,

2011.  The appeal[11] became ripe for disposition on June

17, 2011, when Pavlik elected not to file a reply brief.

**STANDARD OF REVIEW**

        When considering a social security appeal, we

have plenary review of all legal issues decided by the

Commissioner.  See <u>Poulos v. Commissioner of Social</u>

<u>Security</u>, 474 F.3d 88, 91 (3d Cir. 2007); <u>Schaudeck v.</u>

<u>Commissioner of Social Sec. Admin.</u>, 181 F.3d 429, 431

(3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857,

858 (3d Cir. 1995).  However, our review of the

Commissioner's findings of fact pursuant to 42 U.S.C. §

405(g) is to determine whether those findings are

supported by "substantial evidence."  <u>Id.</u>; <u>Brown v.</u>

<u>Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v.</u>

<u>Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual

findings which are supported by substantial evidence

must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v.</u>

───────────────────

11.  Under the Local Rules of Court, "[a] civil action
brought to review a decision of the Social Security
Administration denying a claim for social security
disability benefits" is "adjudicated as an appeal."
M.D.Pa. Local Rule 83.40.1.

Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the
ALJ's findings of fact are supported by substantial
evidence, we are bound by those findings, even if we
would have decided the factual inquiry differently.");
Cotter v. Harris, 642 F.2d 700, 704 (3d Cir.
1981)("Findings of fact by the Secretary must be
accepted as conclusive by a reviewing court if supported
by substantial evidence."); Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d
171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d
1520, 1529 & 1529 n.11 (11th Cir. 1990).

       Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such
relevant evidence as a reasonable mind might accept as
adequate to support a conclusion.'" Pierce v. Underwood,
487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co.
v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v.
Commissioner of Social Security, 529 F.3d 198, 200 (3d
Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d
Cir. 1999).  Substantial evidence has been described as

more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting

certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642

F.2d at 706-707.  Therefore, a court reviewing the

decision of the Commissioner must scrutinize the record

as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d

Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407

(3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

        To receive disability benefits, the plaintiff

must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be

expected to result in death or which has lasted or can

be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 432(d)(1)(A).

Furthermore,

>           [a]n individual shall be determined to be under
>           a disability only if his physical or mental
>           impairment or impairments are of such severity
>           that he is not only unable to do his previous
>           work but cannot, considering his age, education,
>           and work experience, engage in any other kind of
>           substantial gainful work which exists in the
>           national economy, regardless of whether such
>           work exists in the immediate area in which

he lives, or whether a specific job vacancy
exists for him, or whether he would be hired if
he applied for work.  For purposes of the
preceding sentence (with respect to any
individual), "work which exists in the national
economy" means work which exists in significant
numbers either in the region where such
individual lives or in several regions of the
country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance benefits claims.  See 20
C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This
process requires the Commissioner to consider, in
sequence, whether a claimant (1) is engaging in
substantial gainful activity,[12] (2) has an impairment
that is severe or a combination of impairments that is
severe,[13] (3) has an impairment or combination of

_____

12.  If the claimant is engaging in substantial gainful
activity, the claimant is not disabled and the
sequential evaluation proceeds no further. Substantial
gainful activity is work that "involves doing
significant and productive physical or mental duties"
and "is done (or intended) for pay or profit."  20
C.F.R. § 404.1510.

13.  The determination of whether a claimant has any
severe impairments, at step two of the sequential
(continued...)

17

impairments that meets or equals the requirements of a listed impairment,[14] (4) has the residual functional capacity to return to his or her past work and (5) if

_____

13. (...continued)
evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

14. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step.

not, whether he or she can perform other work in the
national economy. Id. As part of step four the
administrative law judge must determine the claimant's
residual functional capacity. Id.[15]

Residual functional capacity is the individual's
maximum remaining ability to do sustained work
activities in an ordinary work setting on a regular and
continuing basis. See Social Security Ruling 96-8p, 61
Fed. Reg. 34475 (July 2, 1996). A regular and
continuing basis contemplates full-time employment and
is defined as eight hours a day, five days per week or
other similar schedule. The residual functional
capacity assessment must include a discussion of the
individual's abilities. Id.; 20 C.F.R. § 404.1545;
Hartranft, 181 F.3d at 359 n.1 ("'Residual functional
capacity' is defined as that which an individual is
still able to do despite the limitations caused by his
or her impairment(s).").

---

15. If the claimant has the residual functional
capacity to do his or her past relevant work, the
claimant is not disabled.

19

**DISCUSSION**

The administrative law judge, at step one of the sequential evaluation process found that Pavlik had not engaged in substantial gainful work activity since August 2, 2007, the alleged disability onset date. Tr. 15.

At step two of the sequential evaluation process, the administrative law judge found that Pavlik had the following severe impairments: "complex regional pain syndrome/causalgia, disorders of the back, a major depressive disorder with psychotic features, a conversion disorder, an anxiety disorder, and post-traumatic stress disorder." Tr. 15.

At step three of the sequential evaluation process, the administrative law judge found that Pavlik's impairments did not individually or in combination meet or equal a listed impairment. Tr. 16-19.

At step four of the sequential evaluation process, the administrative law judge found that Pavlik

could not perform his prior relevant skilled, sedentary work[16] but had the residual functional capacity to perform a limited range of unskilled, sedentary work as defined in the regulations. Tr. 19.  Specifically, the administrative law judge found that Pavlik could perform sedentary work

> except for work that requires standing and walking more than a cumulative 2 hours out of an 8-hour workday.  In addition, the claimant must be afforded the option to sit and stand during the workday.  Moreover, the claimant is limited to occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling and climbing and limited to occasional overhead reaching, pushing and pulling with the upper extremities, to include the operation of hand levers, and no exposure to dangerous machinery and unprotected heights.  Further, the claimant is limited to simple, routine, repetitive tasks, not performed in a fast-paced production or quota-based environment, involving only simple, work-related decisions, and in general relatively few workplace changes. Finally, the claimant is limited to occasional interaction with supervisors, coworkers, and the general public.

_____

16.  Past or prior relevant employment in the present case means work performed by Pavlik during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner.  20 C.F.R. §§ 404.1560 and 404.1565.

Tr. 19.

At step five, the administrative law judge, based on a residual functional capacity of a limited range of sedentary work as described above, and the testimony of a vocational expert, found that Pavlik had the ability to perform unskilled work as a product inspector (DOT # 669.687-014), nut sorter (DOT # 521-687-086), an ampoule sealer (DOT # 559-687-014), and a grinding machine operator (DOT # 690.685-194),[17] and that

---

17.  When identifying occupations which Pavlik could perform, the vocational expert referred to the Dictionary of Occupational Titles (DOT) numbers for the positions. "The Social Security Administration has taken administrative notice of the reliability of the job information contained in the Dictionary of Occupational Titles . . . and often relies upon it . . . ." Burns v. Barnhart, 312 F.3d 113, 126 (3d Cir. 2002). The Dictionary of Occupational Titles sets forth job information, including the exertional and skill level necessary to perform each occupation. A review of the descriptions of these positions in the Dictionary of Occupational Titles reveals that they are all sedentary, unskilled positions.  Dictionary of Occupational Titles Fourth Edition, Revised 1991, United States Department of Labor, http://www.oalj.dol.gov/LIBDOT.HTM (Last accessed January 19, 2012).

there were a significant number of such jobs in the
local and national economies. Tr. 25.

The administrative record in this case is 738
pages in length and we have thoroughly reviewed that
record.  The administrative law judge did an excellent
job of reviewing Pavlik's vocational history and medical
records in his decision. Tr. 15-25.  Furthermore, the
brief submitted by the Commissioner sufficiently reviews
the medical and vocational evidence in this case. (Doc.
11, Brief of Defendant.)

Pavlik argues that the administrative law judge
erred by failing to find at step three of the sequential
evaluation process that his impairments met or equaled a
listed impairment.  Pavlik also argues that the
administrative law judge's determination that he has the
residual functional capacity to perform a limited range
of unskilled, sedentary work is not supported by
substantial evidence.  In making this second argument,
Pavlik contends that the administrative law judge

inappropriately rejected the opinions of treating physicians.  We find no merit in Pavlik's arguments.

Pavlik's first argument is premised on the contention that he met the requirements of certain mental health listings.  The purpose of the Listings of Impairments is to describe impairments "severe enough to prevent a person from doing any gainful activity," regardless of age, education or work experience.  20 C.F.R. § 404.1525(a); see also Sullivan v. Zebley, 493 U.S. 521, 532 (1990).  The Listings operate as a presumption of disability without further inquiry as to whether the claimant can actually perform prior relevant work or other work available in the local, regional or national economies. Id.  To qualify for benefits by showing that an impairment, or combination of impairments, is equivalent to a listed impairment, Pavlik had the burden of presenting "medical findings equivalent in severity to all the criteria for the one most similar impairment." Sullivan v. Zebley, 493 U.S. at 531; Bowen v. Yuckert, 482 U.S. 137, 146 n.5

(1987)(stating that it is the claimant's burden to
present medical findings that show that his impairment
matches or is equal in severity to a listed impairment).

     Pavlik did not specify the listings in his
brief.  We will assume that Pavlik is arguing that he
met the requirements of the mental health listings
reviewed by the administrative law judge in his
decision. Tr. 16-19. Those listings were 12.02 (Organic
Mental Disorders), 12.04 (Affective Disorders), 12.06
(Anxiety Related Disorders) and 12.08 (Personality
Disorders). Id.

     Listings 12.02, 12.04 and 12.06 have paragraphs
"A", "B", and "C" criteria.  Listing 12.08 has
paragraphs "A" and "B" criteria.  We will assume that
Pavlik met the paragraph A criteria of those listings
because the Commissioner does not address paragraph A of
the listings in his opposition brief.

     All of the referenced listings, however, require
a claimant to meet either the paragraph B criteria or
the paragraph C criteria.  To satisfy the paragraph B

25

criteria, the mental impairment must result in at least two of the following: marked restrictions in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of an extended duration.  A marked limitation means more than moderate but less than extreme.  Repeated episodes of decompensation, each of an extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks.

The paragraph C criteria of Listings 12.02 and 12.04 require evidence of repeated episodes of decompensation, each of an extended duration; or a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to cause the individual to decompensate; or a current history of 1 or more years's inability to function outside a highly supportive living arrangement

with an indication of continued need for such an
arrangement.   The paragraph C criteria of Listing 12.06
requires a complete inability to function independently
outside the area of one's home.[18]

The administrative law judge found that Pavlik
had mild limitations with respect to activities of daily
living; moderate limitations in social functioning and
concentration, persistence or pace; and had experienced
no episodes of decompensation of an extended duration.
Tr. 16-18.  In so finding the administrative law judge
relied on his review of Pavlik's written submissions and
testimony regarding his activities.  The administrative
law judge's review also involved an assessment of
Pavlik's credibility.

In the written submissions Pavlik reported that
he lived both in his parents' home and alone in an
apartment. Tr. 211. Pavlik stated that he assisted his

---

18. There is no evidence in the record that Pavlik has
a complete inability to function independently outside
the area of his home or a current history of 1 or more
year's inability to function outside a highly
supportive living arrangement.

27

mother with housework, cared for personal needs,
prepared meals, shopped in stores 1 to 3 times per week,
and washed clothes and dishes. Tr. 211-214. Pavlik
stated that he could walk, drive, go out alone, pay
bills, count change, handle a savings account and use a
checkbook and money orders. Tr. 214. Pavlik revealed
that he socializes with others by going shopping and out
to eat. Tr. 215. Pavlik admitted that he could finish
what he started; follow written instructions "OK"; get
along with authority figures "great"; handle stress
"great"; and deal with changes in routine after a
"little while." Tr. 217.  He reported that he was never
let go from a job because of problems getting along with
other people. Id.

　　　　At the administrative hearing, Pavlik testified
that he lived with his mother,[19] whom he helped with
housework, cooking, and shopping for groceries. Tr. 39-
41. Pavlik stated that he drove his mother wherever she

───────────────

19.  The record reveals that Pavlik's mother resides in
North Huntingdon in the western part of Pennsylvania.
Tr. 221.

wanted to go, and drove to Philadelphia (a one-way trip
of 6-8 hours) for medical appointments. Tr. 42-43.
Pavlik denied problems with personal care. Tr. 43.
Pavlik stated that he attended church 4 times a week
with his mother; socialized with a friend in
Philadelphia by shopping and going out to eat; and
occasionally socialized with family and church members.
Tr. 50-52.

     The administrative law judge also relied on the
opinion of a physician, Viharika Bakshi, M.D., who
examined Pavlik and a state agency physician, Louis
Tedesco, M.D., who reviewed Pavlik's medical history.

     On May 13, 2008, Pavlik was examined by Dr.
Bakshi. Tr. 603-606.  When Dr. Bakshi conducted a review
of Pavlik's systems,[20] Pavlik denied the following:
anorexia, fatigue, chills, fevers, bruising, excessive

_____

20.  "The review of systems (or symptoms) is a list of
questions, arranged by organ system, designed to
uncover dysfunction and disease." A Practical Guide to
Clinical Medicine, University of California, School of
Medicine, San Diego, http://meded.ucsd.edu/
clinicalmed/ros.htm (Last accessed January 20, 2012).

sweating, itching, rash, blurry vision, headaches,
double vision, visual loss, hearing loss, ear pain,
vertigo, voice change, cough, dyspnea, wheezing, chest
pain, irregular heartbeat, shortness of breath, swelling
or mass, nausea, vomiting, muscle weakness, myalgia,[21]
difficulty speaking, loss of consciousness, and anxiety.
Tr. 604-605.  Pavlik did complain of neck pain and neck
stiffness, constipation and heartburn, joint pain,
tingling in both upper arms, change in sleep pattern,
depression and inability to concentrate. Id.  However,
the results of physical examination of Pavlik were
essentially normal. Id.  Although Pavlik had diffuse
tenderness in his cervical area and shoulders, he had
normal range of motion in those areas.[22] Id.  Pavlik had
no tenderness in the lumbar spine and no point

––––––––––––––––

21.  Myalgia is "pain in a muscle or muscles." Dorland's
Illustrated Medical Dictionary, 1083 (27th Ed. 1988).

22.  An MRI of the cervical spine taken on August 2,
2004, revealed that Pavlik had a posterior cervical
disc herniation at the C7-T1 level but no evidence of
neural foraminal narrowing or spinal cord compression.
Tr. 254.

tenderness in his other joints. Id.  He also had normal
range of motion in his spine, ankles, hips and knees.
Id.  Neurologically, Pavlik was alert and oriented; he
did not use an assistive device, such as a cane; and he
had grossly intact cranial nerves, 4/5 motor function,
normal sensation, no muscle atrophy, negative straight
leg raising, and a normal gait. Tr. 605-606.  Dr.
Bakshi noted that, psychiatrically, Pavlik's affect was
flat but otherwise unremarkable. Tr. 606.  Dr. Bakshi
concluded that Pavlik suffered from a cervical strain, a
history of a herniated cervical disc and depression. Id.

On April 29, 2008, Dr. Tedesco reviewed Pavlik's
medical records and concluded that Pavlik had the
physical ability to engage in light work. Tr. 595-601.

The opinions of both Dr. Bakshi and Tedesco
support the administrative law judge's conclusion that
Pavlik has the functional ability to engage in at least
a limited range of full-time unskilled, sedentary work.

The administrative law judge's decision is also
supported by the opinion of Francis Murphy, Ph.D., a

state agency psychologist, who reviewed Pavlik's medical
history and concluded that Pavlik had mild restrictions
in activities of daily living; moderate difficulties in
maintaining social functioning; mild difficulties in
maintaining concentration, persistence or pace; and no
repeated episodes of decompensation. Tr. 587. Dr.
Murphy's report supports the administrative law judge's
conclusion that Pavlik's impairments did not meet or
equal a listed impairment.  Dr. Murphy further opined
that although Pavlik could not return to his prior
relevant work in light of the alleged abusive work
environment, the evidence failed to show that Pavlik had
mental functional limitations which would prevent him
from engaging in other full-time work. Tr. 588.  The
opinions of Dr. Bakshi, Dr. Tedesco, and Dr. Murphy
clearly support the administrative law judge's
conclusion that Pavlik had the residual functional
capacity to engage in a limited range of unskilled,
sedentary work.

Pavlik, however, argues that the administrative
law judge should have rejected the opinions of the state
agency physicians and psychologist and should have
relied instead on the opinions of his treating
physicians and non-treating, examining physicians, who
performed evaluations to determine whether Pavlik was
entitled to federal workers' compensation benefits.

The Court of Appeals for this circuit has set
forth the standard for evaluating the opinion of a
treating physician in <u>Morales v. Apfel</u>, 225 F.3d 310 (3d
Cir. 2000).  The Court of Appeals stated in relevant
part as follows:

> A cardinal principle guiding disability
> eligibility determinations is that the ALJ
> accord treating physicians' reports great
> weight, especially "when their opinions reflect
> expert judgment based on a continuing
> observation of the patient's condition over a
> prolonged period of time. . . ."  [T]he ALJ
> must consider the medical findings that support
> a treating physician's opinion that the claimant
> is disabled.  In choosing to reject the treating
> physician's assessment, an ALJ may not make
> "speculative inferences from medical reports"
> and may reject "a treating physician's opinion
> outright only on the basis of contradictory
> medical evidence" and not due to his or her own

credibility judgments, speculation or lay
opinion.

Id. at 317-18 (internal citations omitted). The
administrative law judge is required to evaluate every
medical opinion received. 20 C.F.R. § 404.1527(d).

The social security regulations specify that the
opinion of a treating physician may be accorded
controlling weight only when it is well-supported by
medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with other
substantial evidence in the case. 20 C.F.R. §
404.1527(d)(2); SSR 96-2p.  Likewise, an administrative
law judge is not obliged to accept the testimony of a
claimant if it is not supported by the medical evidence.
An impairment, whether physical or mental, must be
established by "medical evidence consisting of signs,
symptoms, and laboratory findings," and not just by the
claimant's subjective statements.  20 C.F.R. § 404.1508
(2007).  In this case the administrative law judge
appropriately considered the contrary medical opinions

of Pavlik's treating physicians and the objective medical evidence and concluded that the opinions of the treating physicians, Dr. Daisy Rodriguez, Dr. George Rodriguez, and Harry Doyle, M.D., were not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings.  The administrative law judge also appropriately rejected the opinions of the non-treating but examining psychiatrists who imposed work-preclusive limitations.  The non-treating psychiatrists' opinions are entitled to no special treatment as compared to the opinions of the state agency physicians.

After the April, 2004 incident at work, Pavlik received treatment from Dr. Geld and then by Leonard B. Kamen, D.O.  Tr. 274 and 344.  Dr. Geld referred Pavlik to a physical therapist. Id.  Physical therapy consisted of ultrasound, electrical stimulation, moist heat, and exercises. Id.  On May 18, 2004, Pavlik was seen apparently for the first time by Dr. Kamen. Tr. 274-276. Dr. Kamen noted that Pavlik was "[f]unctionally . . .

35

independent in self-care, using no assistive devices"
and that Pavlik's gait was "symmetric but slow and
stable." Tr. 274-275. Dr. Kamen noted that Pavlik had
an anxious mood and affect and that he was sometimes
tearful. Tr. 275.

With respect to Pavlik's alleged burns, Dr.
Kamen stated that "[t]here were no indicators of a
residual burn disorder." Id. Dr. Kamen diagnosed Pavlik
as suffering from "[c]ausalgic pain of neck and shoulder
girdle status post hot coffee burn injury on April 8,
2004" and "[p]osttraumatic stress disorder with
hypervigilance, sleep disturbance, and anxiety[.]" Id.
Dr. Kamen recommended "a course of continued physical
exercise," the use of "a Lidoderm patch" and prescribed
Effexor to alleviate Pavlik's "anxiety and stress
associated with his posttraumatic disorder." Tr. 276.
Dr. Kamen also encourage Pavlik "to get out and
exercise" during the summer. Id. Dr. Kamen scheduled a
follow-up appointment in six weeks. Id. There is no

indication in the record that Pavlik had further treatment by Dr. Kamen.

Between July, 2004, and April, 2009, Pavlik treated on monthly basis either with George L. Rodriguez, M.D., or Daisy A. Rodriguez, M.D., for causalgia (also known as complex regional pain syndrome) and neck and shoulder pain. Tr. 323-354, 368-534 and 612-704. Pavlik's treatment included rest, analgesics, muscle relaxants, acupuncture, orthopedic shoes, a home exercise program, and physical therapy. Tr. 272, 277-322, 368-534 and 612-704. Drs. George and Daisy Rodriguez consistently reported that Pavlik could sit comfortably in the examination chair, had tenderness and limited range of motion in his neck,[23] tenderness in his shoulders, a ventral hernia in his abdomen, and normal neurological findings. Tr. 323-54, 368-534 and 612-704.

---

23. Dr. George Rodriguez did note, however, at the first appointment he had with Pavlik on July 8, 2004, that with respect to Pavlik's neck he had "full-range of motion in all directions." Tr. 346.

Pavlik was evaluated to determine his functional capacity on three occasions by Margaret Flynn, M.S., a licensed physical therapist, associated with Injury Rehabilitation Centers of Pennsylvania, the organization through which Drs. George and Daisy Rodriguez practiced medicine. Tr. 444-460 and 519-533.

In January 2005, Ms. Flynn concluded that Pavlik could perform a range of light work on a full-time basis. Tr. 519-520.  Ms. Flynn concluded that Pavlik could frequently lift and carry up to 10 pounds and occasionally lift and carry up to 20 pounds; he could frequently sit, stand and walk. Id.  In January 2006, Ms. Flynn again concluded that Pavlik could engage in full-time light work even though she was aware that Dr. George Rodriguez had limited Pavlik to 4 hours of work per day. Tr. 444-445.

On June 13, 2008, Ms. Flynn performed the third functional capacity evaluation of Pavlik. Tr. 666-682. Ms. Flynn concluded that Pavlik could engage in full-time sedentary employment with a sit/stand option. Tr.

666-667.  Despite Ms. Flynn's opinions, Dr. Rodriguez limited Pavlik to light work for 4 hours per day through May, 2008, and from July, 2008, forward to sedentary work for 4 hours per day.[24] Tr. 613-704.

Between February, 2007 and January, 2008, psychiatrist Dr. Doyle treated Pavlik's mental impairments with individual psychotherapy and medications, including the antidepressant Celexa. Tr. 535-576.  A report of a mental status examination of Pavlik by Dr. Doyle on February 1, 2007, reveals in pertinent part that:

> James Pavlik arrived promptly for the evaluation, was unaccompanied and was neatly groomed, casually dressed and wore glasses. . . . He was shy and mildly inhibited socially, did not display any unusual mannerisms[,] was able to provide a coherent and detailed history. His intelligence was estimated to be in the average to above average range.  He was alert and oriented to person, place and time, recent and remote memory were intact and reasoning and judgment were mildly impaired.  Mr. Pavlik

---

24.  Oddly, on June 14, 2005, Dr. George Rodriguez, signed a document indicating that Pavlik could work 8 hours per day, Pavlik would not need vocational rehabilitation services, and that Pavlik had not reached maximum improvement.  Tr. 155.

scored 30/30 on the Mini Mental State
Examination[25] and was able to repeat 6 digits
forward and 4 in reverse, indicating mild
impairment in attention and concentration. His
affect was restricted but appropriate to the
content of the evaluation and his mood was
anxious and depressed.  He spoke at a normal
rate and tone, exhibited no speech impediments
and his speech pattern was logical, coherent and
goal directed.  He did not report delusions,
hallucinations, obsessive thoughts or compulsive
behaviors and denied suicidal or homicidal
ideations.  Mr. Pavlik was preoccupied with his
physical and emotional symptoms and described
feeling hopeless regarding his ability to adjust
to his work environment.

Tr. 550.  Dr. Doyle concluded that Pavlik suffered from

chronic posttraumatic stress disorder and conversion

disorder.  Id.  He further gave Pavlik a Global

Assessment of Functioning (GAF) score of 55.[26]

---

25.  The Mini Mental State Examination is a test of
cognitive function and a score of 23 or lower indicates
a cognitive impairment.

26.  The GAF score allows a clinician to indicate his
judgment of a person's overall psychological, social
and occupational functioning, in order to assess the
person's mental health illness.  *Diagnostic and
Statistical Manual of Mental Disorders* 3–32 (4th ed.
1994). A GAF score is set within a particular range if
either the symptom severity or the level of functioning
falls within that range.  Id. The score is useful in
planning treatment and predicting outcomes.  Id.  A GAF
(continued...)

40

Plaintiff attended weekly psychotherapy sessions with Dr. Doyle through the first week of January 2008. Tr. 552-576.  A mental status examination on February 8, 2007, revealed a mild cognitive impairment. Tr. 552. However, a mental status examination on January 2, 2008, revealed no cognitive impairment.[27] Tr. 576.

During the sessions with Dr. Doyle, Pavlik reported decreased anxiety, improved sleep, a stable mood with medication, and few to no medication side effects. Tr. 558-576.  Dr. Doyle initially stated that Pavlik was "partially disabled due to work related psychiatric impairments," Tr. 552, and emphasized that

---

26.  (...continued)
score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id

27.  During at least 50 percent of the sessions Dr. Doyle reported no cognitive impairment and he never reported that Pavlik suffered from more than a mild cognitive impairment.

his "partial disability" was connected to his present work environment, "aggravated by difficulties with management." Tr. 560-561.

At an appointment on June 13, 2007, Dr. Doyle noted that Pavlik reported "decreased anxiety, stable mood and no medication side effects." Tr. 561. Furthermore, Dr. Doyle indicated that "he remains disabled by his work related psychiatric impairments, aggravated by ongoing difficulties with management" and "encouraged him to use the USAJobs website, the official site for the Federal Government, to find a suitable position." Id.

On August 3, 2007, Dr. Doyle issued a report in which he stated that "no further improvement in Mr. Pavlik's psychiatric condition and functionality is likely unless and until he is removed from his present work environment" and that "Mr. Pavlik is presently unable to perform the duties of his current job due to work related psychiatric impairments." Tr. 542. Also, in August, 2007, Dr. Doyle indicated that Pavlik was

42

"totally" disabled because of work related psychiatric impairments and encouraged him to find a different job. Tr. 561-564.

In November, 2006, and July, 2007, Maurie Pressman, M.D., performed independent medical evaluations of Pavlik to determine whether Pavlik was entitled to  workers' compensation benefits. Tr. 355-362.  Dr. Pressman opined that the stressful nature of Pavlik's work environment caused anxiety which limited Pavlik to working 4 hours per day.  Dr. Pressman suggested that Pavlik's condition would not improve unless he was placed in a more friendly work environment. Tr. 356.  Dr. Doyle in his treatment sessions and assessments after July, 2007, relied on Dr. Pressman's evaluations. Tr. 538.

As stated above, the last appointment Pavlik had with Dr. Doyle was on January 2, 2008. Tr. 576. There is no indication that Pavlik received mental health treatment from Dr. Doyle or any other mental health care provider after that date.

In May and June 2009, Dr. Doyle completed physical and mental residual functional capacity assessments in which he stated that Pavlik had work-preclusive mental and physical limitations. Tr. 720-726. These assessments were obtained by Pavlik's attorney and submitted during the administrative proceedings relating to Pavlik's claim for social security disability insurance benefits.  There is no indication that, in preparing the RFC assessments, Dr. Doyle had recently examined Pavlik or provided him with psychotherapy.

Also, in June 2009, Kyle Kampman, M.D., performed an independent psychiatric examination of Pavlik to be presented in connection with Pavlik's claim for federal workers' compensation benefits. Tr. 710-19 and 727-738.  Dr. Kampman provided a summary of the evidence he reviewed. Tr. 713-15.  He noted that Dr. Valentino, an orthopedist who examined Pavlik on two occasions, found normal physical findings and concluded that Pavlik had fully recovered from the April 2004

injury from an orthopedic, neurological, and spine standpoint without residual effects. Tr. 715.

Dr. Kampman reported that Pavlik made good eye contact, was calm and cooperative, and appeared alert and oriented. Tr. 734.  Pavlik had a slightly restricted affect, depressed mood, normal speech, logical and goal-directed thoughts, fair insight, and fair judgment. Tr. 734-735.  Dr. Kampman found no evidence of a thought disorder, and Pavlik denied hallucinations and suicidal or homicidal thoughts. Tr. 734.  Dr. Kampman's assessment was that Pavlik suffered from major depression with psychotic features and conversion disorder. Tr. 736.  Dr. Kampman gave Pavlik a GAF score of 45. Id.  In the context of the workers' compensation proceedings, Dr. Kampman stated that major depression currently makes this patient disabled. Tr. 738.

The administrative law judge, referencing, inter alia, the opinions of the state agency experts, the functional capacity evaluations of Ms. Flynn, and Dr. Valentino's assessment, gave an adequate explanation for

rejecting the opinions of Pavlik's treating physicians.[28]

_____

28.  The administrative law judge also gave an adequate reason for rejecting the opinion of the non-treating physicians, Dr. Kampman and Dr. Pressman. The opinions of those physicians were given within the context of the workers' compensation proceedings.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.

s/Sylvia H. Rambo
United States District Judge

Dated:  February 7, 2012.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES PAVLIK,                    :
                                 :
          Plaintiff              :     CIVIL NO. 4:10-CV-2305
                                 :
     vs.                         :
                                 :
MICHAEL J. ASTRUE,               :
COMMISSIONER OF SOCIAL           :     (Judge Rambo)
SECURITY,                        :
                                 :
          Defendant              :

<u>ORDER AND JUDGMENT</u>

In accordance with the accompanying memorandum,

**IT IS HEREBY ORDERED THAT:**

1. The Clerk of Court shall enter judgment in favor of the Commissioner and against James Pavlik as follows:  The decision of the Commissioner of Social Security denying James Pavlik disability insurance benefits is affirmed.

2. The Clerk of Court shall close this case.

s/Sylvia H. Rambo
United States District Judge

Dated:  February 7, 2012.